IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| H.Y., a minor, by her father, K.Y., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:04-cv-1164-MEF |
| | ) | (WO) |
| RUSSELL COUNTY BOARD OF EDUCATION, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Fifteen Russell County Middle School students ("Plaintiffs") bring this action against school employees Larry D. Screws, Jacqueline Grant, and Gloria Alexander ("Defendants"), alleging that Defendants searched them in violation of the Fourth Amendment and Alabama law. Plaintiffs assert claims under 42 U.S.C. § 1983 for violation of their federal constitutional rights and under Alabama law for assault, battery, invasion of privacy, and outrage. Plaintiffs seek damages, injunctive relief, expenses, fees, and costs. This cause is before the Court on Defendants' Motion for Summary Judgment (Doc. # 41) filed June 26, 2006. Defendants assert that they are entitled to qualified and State-agent immunity. Alternatively, they contend that they did not violate Plaintiffs' constitutional rights or commit any tort. The Court has reviewed the submissions of the parties and carefully considered the arguments in support of and in opposition to the Motion. For the reasons stated herein,

Defendants' Motion is due to be GRANTED IN PART and DENIED IN PART.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 1367 (supplemental jurisdiction).  The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.   An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995) (internal quotation marks and citations omitted)).

The party seeking summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the nonmovant).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material

3

fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

## FACTS AND PROCEDURAL HISTORY

The Court has carefully considered all documents submitted in support of and in opposition to the motion.  Viewed in the light most favorable to Plaintiffs, the submissions of the parties establish the following relevant facts.

*I.  The Parties*

Plaintiffs were seventh grade students in Angela Knight's fourth period Advanced English class at Russell County Middle School in the fall of 2004.  At the time, they were twelve or thirteen years of age.  A.A., M.A., K.F., E.H., B.H., H.J., J.L., K.T., and H.Y. are girls while T.A., J.H., P.M., J.R., T.S., and C.W. are boys.

Larry D. Screws ("Screws") was the principal of Russell County Middle School.  He had been an assistant principal for approximately seventeen years before becoming the principal of Russell County Middle School, and had about eleven years of experience in education before becoming an assistant principal.  Jacqueline Grant ("Grant") was an assistant principal at the school.  She had been an assistant principal for approximately three years.  Gloria Alexander ("Alexander") was a counselor at Russell County Middle School.

*II.  The Pre-Search Events*

In the fall of 2004, Angela Knight ("Knight") taught Advanced English during fourth period at Russell County Middle School to approximately twenty-five students. Lunch was

in the middle of the Advanced English class.  On November 1, 2004, Knight either took her class to the library and then straight to lunch, or directly to lunch.[1]  Knight usually left her purse, makeup bag, makeup, and some cash (in this case, twelve dollars) on her chair or near her desk during lunch.  On November 1, she left these possessions in or near her desk.[2]  The purse and makeup bag were made by Louis Vuitton, and the makeup bag cost about $450.  Knight generally did not lock her classroom while she and her class were at the library or at lunch, and she often left the door open as well.  On November 1, the classroom door was left open and unlocked when Knight and the students went to the library or to lunch.[3]

During lunch, H.Y. and H.J. told Knight that they needed to go back to the classroom to retrieve something from the classroom.  Knight gave them permission, and H.Y. and H.J. left the lunchroom and did not return during lunch.  M.A. and K.T. also asked for and received permission to go back to the classroom before lunch to get their lunch money; they returned to the lunchroom during the lunch period.  After the lunch period was over, Knight took the class back to her classroom.  H.Y. and H.J. were still in the classroom when Knight

---

[1] Some students testified that the class went to the library and then to lunch; others testified that the class went directly to lunch and did not go to the library.

[2] According to some students, on this occasion Knight placed her purse in her chair.  Other students thought that she had put it behind her desk or that she put it in a drawer.  Knight testified that she put the purse in the bottom right door of her desk.

[3] Whether the door was open or not is disputed, but multiple students testified that it was open.

and her class returned from lunch.[4]

When she returned to her desk, Knight was unable to find her makeup bag and the twelve dollars.  She told the students that her makeup bag and money were missing.  Knight asked the students whether any of them had seen her makeup bag, and they responded that they had not.  She then went to talk to the teacher whose classroom was next to hers, Mrs. Curry ("Curry").  Curry told Knight that she should hold her class (because the bell had rung) and call Screws.  Knight called the principal's office from a phone in the classroom and said that she could not find her makeup bag.  Screws, Grant, and Alexander soon arrived in the classroom.

### III.  The Classroom Searches

Defendants asked Knight what the problem was, and she responded that her makeup bag and money were missing.  Grant told the students to sit down and not to move.  Screws told the students that they could not leave the classroom and that they would be strip searched.[5]  Defendants also told the students that they would be searching the students' books, shoes, socks, and pockets.  The students were told to empty their book bags.  Grant and Alexander searched the students' books, purses, book bags, and other possessions.  Screws may have searched some of the students as well.  Defendants further required that the

---

[4] Several students recalled, however, that no students were already in the classroom when the class returned from lunch.

[5] Some students remember Screws mentioning "search" but not "strip search."  It is unclear whether Screws told the students they would be strip searched before the searches in the classroom, after them, or both.

students remove their shoes and socks.

Some students pulled out their pants pockets and some had them patted by Grant or Alexander. Grant patted T.A.'s front pockets when they were pulled out and stuck her hand into his pockets. Grant also patted H.J. and A.A.'s pockets. She reached into C.W. and P.M.'s pockets while she was searching them. She put her hand into J.H.'s pockets, "running her hand down [his] thigh." Alexander reached into J.R.'s front and back pockets. Alexander then told J.R. not to tell his mother that she was "harassing" or "sexually harassing" him.[6]

Alexander found a bottle of pills in E.H.'s purse, and announced what she found. She also found a condom in E.H.'s purse, and said that she "found those all the time" while holding it up in front of the class. When she found a tampon, she asked whether it was a tampon and put it on top of E.H.'s desk. When Grant found a bottle of ibuprofen in K.T.'s purse, she held it up and said that K.T. had pills in her purse.

Meanwhile, Screws took several of the boys into the hallway and asked them some questions. During or after the search of the students in the classroom, Screws found the makeup bag in a trash can in the boys' bathroom and took it back to the classroom. He gave the makeup bag to Knight. Knight's money, however, was not in the bag. Screws asked the class if anyone had found the twelve dollars, but no one had. Knight told Defendants that she was not concerned about the twelve dollars because Screws had found her makeup bag

---

[6] J.R. is not sure which of these Alexander said, but he is sure that she said either "harassing" or "sexually harassing."

and makeup.   Screws said that he was "tired of everything coming up missing around the school" and told the students that Defendants would take the students to the bathroom and strip search them.[7]

*IV.  The Strip Searches*[8]

Screws told the class that Defendants would search the students in the bathrooms, and said that any student who did not comply would be suspended.  He said that the girls would go with Grant and Alexander and the boys would go with him.  The students sat in the classroom when they were not being searched.  Screws told the students to sit down and wait. Knight told Defendants that A.A. and B.H. could not have taken her possessions,[9] but one of the Defendants said that they had to search everyone.

E.H. asked to call her parents.  One of the Defendants said that she would not be allowed to do so.  Before he was taken to the bathroom, P.M. told Grant that he wanted to call his mother.  Grant told him that he could not leave and that if he left, he would be punished.

Alexander began taking the girls to the bathroom to search them.  Knight was in the

---

[7] Again, it is not clear whether Screws said this before or after the classroom searches, or both.  Some students testified that Screws announced that the students would be strip searched soon after he arrived in the classroom; others testified that he did so after he found the makeup bag in the boy's bathroom.

[8] Defendants contest the use of the term "strip search."  The Eleventh Circuit has used that term to describe a search similar to the one here, and this Court will use it as well.  *See Thomas v. Roberts*, 323 F.3d 950, 952, 952 n.2 (11th Cir. 2003) (*Thomas II*).

[9] A.A. and B.H. were with Knight from the time the class left the classroom until they returned from lunch.

bathroom during the search of E.H.  Some of the girls were taken to the bathroom individually while some were taken in groups of two.  Once she took the students into the bathroom, Alexander generally asked them to drop their pants to their ankles and pull their shirts up to their shoulders.  She then told them to turn around.[10]  With the exception of E.H., the students did so when Alexander asked them.  Alexander  then told the students to pull their pants back up and pull their shirts down.  She then returned with each girl to the classroom.

Several of the searches differed from the general pattern.  H.Y. heard from some of the other girls that they had to pull their bras up, so she did so as well.  Alexander had not told her to do so; after H.Y. pulled her bra up, Alexander told her she did not have to lift up her bra.  Alexander told H.Y. to drop her pants to her knees and did not require her to turn around.

When Alexander asked E.H. to pull up her shirt and drop her pants to her ankles, E.H. said that she would not comply.  Alexander told E.H. that she would be suspended, but E.H. said that she did not care.  Knight, who was in the bathroom the entire time that E.H. was, convinced Alexander to leave.  Knight then told E.H. that she did not have to be searched. She said that she would tell Defendants that E.H. agreed to be searched so that E.H. would not get in trouble.

Grant took the rest of the girls to the bathroom.  She took some students to the

---

[10] Alexander told H.Y. to drop her pants to her knees, and she did not tell her to turn around. Alexander did tell H.Y. to pull her shirt up.

bathroom individually and some in groups of two.  Grant told the students to go into the stalls. She stood several feet away from the students.  She told the students to lift their shirts up to their shoulders and turn all the way around.[11]  She also indicated to H.J. that she should "shake [her] bra out."  The students were not told, however, to take off their bras.  The students complied with Grant's instructions.  Once Grant had inspected them, the students put their shirts back down and followed her back to the classroom.  Each student was generally in the bathroom for only a few minutes.  Grant did not instruct the students to fully remove[12] (*i.e.*, take off) any article of clothing.  She did not touch the students during the search.

The searches of A.A. and K.T. differed from Grant's searches of the other students. When A.A. lifted her shirt up, her bra came up, and Grant told her that she "didn't want to see that much."  The student responded that she thought that was what Grant meant for her to do.  However, Grant had not told her to remove or pull up her bra.  K.T. testified that Grant told her to drop her pants to her ankles as well as to pull her shirt up to her shoulders.

Screws took the male students to the bathroom individually.  Once Screws and a

---

[11] H.J. was wearing overalls, which she had to unfasten in order to pull her shirt up.  When she did so, her overalls fell to her ankles.  She then turned around as requested by Grant.  She does not remember whether Grant told her to drop her overalls to her ankles.

[12] Defendants argue that the students were not required to remove any article of clothing. While the parties may disagree whether lowering pants or raising a shirt constitutes "removing" clothing, the Eleventh Circuit has used that term to refer to conduct very similar to that which is alleged to have occurred in this case. *See Thomas II*, 323 F.3d at 952, 952 n.2.  Therefore, the Court will use the term "remove" to describe the students' lowering their pants or raising their shirts.

student were in the bathroom, Screws generally told the student to drop his pants to his ankles.[13]  Screws then told the student to raise his shirt to his chest, and told some of the students to raise their arms as well.  All of the students complied with Screws' instructions. Screws and the student then left the bathroom, having been there for no more than ten minutes.[14]

The searches of several of the students by Screws differed from the general pattern. In addition to having him drop his pants and raise his shirt, Screws told J.R. to flip down the front of the waistband of his underwear, which he did.  Screws told T.A. to "wiggle [his] boxers to see if anything fell out."  Screws patted T.A., T.S., and C.W. on their sides after they had removed their clothing.  Screws also patted T.S. on his sides once he had pulled his pants up.  T.A., T.S., and C.W. were wearing underwear and were not asked to remove it or pull it down.  Screws also told T.A. and C.W. to turn around while their clothes were removed.

All of the Plaintiffs were taken to the bathroom to be searched.  Other students not in Knight's class were in the bathroom during some of the searches. Once the strip searches were over, Screws told the students that they could go to their sixth period class.

_____

[13] Some students testified that Screws only told them to drop their pants, not to drop their pants to their ankles.  J.R. testified that Screws only told him to drop his pants, but they dropped to his ankles nonetheless because he had to raise up his shirt to his chest and hold it there.

[14] Screws testified that none of the students raised his shirt higher than the student's stomach. He also testified that none of the students dropped his pants so low that Screws could see all of the student's underwear.  He testified that he told the students to turn around with their clothing removed, but denied that he touched any student.

A number of the students told their parents or grandparents about the searches. Several of their parents or grandparents talked to the Russell County Sheriff's Department or the Phenix City Police Department and filed reports about the incident. Several of the parents also talked with school administrators.

The Russell County School District addressed searches of students in "Student Academic Plan & Statement of Responsibilities: A Handbook for School Personnel, Parents & Students" ("the Handbook"). The Handbook set school board policy regarding searches, and it was binding upon Defendants. Under the heading "Procedures for Search and Seizure," it states that when school officials "have reasonable grounds for believing that a search of a particular student will produce evidence of a violation of school disciplinary rules or of law," the officials may, if the circumstances warrant, search the student's purse or pockets or conduct a pat-down search. This search will be conducted by a school official of the same gender as the student searched and such searches are to be conducted "discretely out of public view" except in emergencies.

According to the Handbook, officials "when possible should avoid frequent and unnecessary group searches (i.e., searches of two or more students where individualized suspicion is lacking)." Such a search is only justified (1) when there are reasonable grounds to believe that evidence of "illegal or dangerous activities" will be found; (2) when the search is justified by the "immediacy of the circumstances" and the "need to protect the safety and welfare of students;" and (3) "when the invasiveness of the search method employed is

minimal."

The Handbook also addresses strip searches.  "If the principal and his/her designee conclude that a more intrusive search (i.e., a "strip search") is needed, they shall call the parents of the students involved and report their suspicions to the police who shall be responsible for any such search.  School employees shall not conduct such searches."

*V. Procedural History*

Plaintiffs brought this action alleging violations of the Fourth Amendment under 42 U.S.C. § 1983 and assault, battery, invasion of privacy, and outrage under Alabama law. (Doc. # 1.)  The Complaint named as Defendants the Russell County Board of Education; Rebecca Lee ("Lee"), Superintendent of the Russell County Schools, in her official capacity; and Screws, Grant, and Alexander individually and in their official capacities. *Id.* Plaintiffs' Motion to Amend Complaint (Doc. # 10) was granted to allow them to add J.L. as a Plaintiff. (Doc. # 11.)  On the same day as their motion was granted, Plaintiffs filed their Amended Complaint.  (Doc. # 13.)

On October 27, 2005, the parties informed the Court that Plaintiffs and Defendants Russell County Board of Education and Lee reached a pro tanto settlement and requested a pro-ami hearing to approve the settlement.  (Doc. # 32.)  Following that hearing, the Court approved the settlement.  (Doc. # 35.)  This settlement resolved all claims against the Board of Education and Lee, and the Court dismissed all claims against them.  (Doc. # 38.)  On June 6, 2006, the remaining Defendants, Screws, Grant, and Alexander, filed a Motion for

Summary Judgment.  (Doc. # 40.)

## DISCUSSION

### I.  Plaintiffs' Federal Constitutional Claims

Defendants first contend that their actions do not rise to the level of a violation of the Fourth Amendment because the search was both justified at its inception and permissible in its scope.  Alternatively, Defendants assert that even if there was a constitutional violation, they are entitled to qualified immunity because the law was not clearly established so as to give them notice that their actions were unconstitutional.  The Court addresses these arguments in turn.

### A.  Existence of a Constitutional Violation

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Fourth Amendment applies to searches of students by public school officials.  *New Jersey v. T.L.O.*, 469 U.S. 325, 334, 337 (1985).  As with any specific class of searches, the Court has determined the standard of reasonableness for school searches by "balancing the need to search against the invasion which the search entails."  *Id.* at 337 (quotation omitted).  It has recognized that "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject."  *Id.* at 340.  The warrant and probable cause requirements, for example, are not applicable to public school searches.  *Id.* at 340-41.

14

The standard for determining the validity of a search by school officials is the "reasonableness, under all the circumstances, of the search." *See id.* at 341. Determining the reasonableness of such a search entails a two-part inquiry. First, a court must consider "whether the . . . action was justified at its inception." *Id.* at 341 (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Second, a court "must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (citing *Terry*, 392 U.S. at 20).

> Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341-42 (footnotes omitted).

The requirement that school officials have reasonable grounds for suspicion of a particular student is subject to a "very limited exception," *see Thomas v. Roberts,* 261 F.3d 1160, 1167 (11th Cir. 2001), *vacated,* 536 U.S. 953 (2002), *reinstated,* 323 F.3d 950 (11th Cir. 2003) (*Thomas I*). A search of public school students "may be conducted without individualized suspicion when 'the privacy interests implicated by the search are minimal, and . . . an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion.'" *See id.* at 1167 (quoting *Skinner*

*v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 624 (1989)) (omission in original); *see also Vernonia Sch. Dist. 47J v. Acton.,* 515 U.S. 646 (1995) (applying the *Skinner* test to a search of students).

A panel of the Eleventh Circuit considered factual circumstances similar to the searches in this case in *Thomas v. Roberts,* 261 F.3d 1160 (11th Cir. 2001), *vacated,* 536 U.S. 953 (2002), *reinstated,* 323 F.3d 950 (11th Cir. 2003) (*Thomas I*). Because of its factual similarity to this case, the Court will discuss it in some detail. In *Thomas I,* a fifth-grade student laid an envelope containing twenty-six dollars on a table, and noticed a few moments later that it was missing. *Id.* at 1163. The teacher obtained authorization to conduct a search and to enlist the aid of a police officer who happened to be at the school. *Id.* The teacher searched the students' book bags, desks, and purses. *Id.* She had them remove their shoes, and she also had the students turn out their front pockets and patted down their back pockets. *Id.*

Unable to find the missing money, the teacher divided the boys up into groups of four or five and sent them to the bathroom with the police officer. *Id.* at 1164. There, the police officer told them to drop their pants, and said that if they did not, they would be suspended or taken to jail. *Id.* All of the boys dropped their pants and some of them dropped their underwear as well. *Id.* While the police officer was searching the boys, a boy from another class, Lester Lenard Grace ("Lenard"), entered the bathroom. *Id.* Lenard told the officer that he was not a member of the same class and that he knew nothing about the missing envelope.

16

*Id.* The police officer told him to pull out his pants pocket and loosen his belt. *Id.* The officer then shook Lenard's pants to see whether the envelope was hidden there. *Id.* Finding nothing, the officer allowed Lenard to leave. *Id.*

Once all of the boys returned to the classroom, the teacher took the girls to the bathroom in groups of two to five. *Id.* Once there, she told them to lower their pants and raise their dresses or shirts. *Id.* Most of the students were told to lift their bras and show their breasts. *Id.* Some students testified that the teacher touched them during the search. *Id.* A girl who arrived in the classroom as the girls were lining up to go to the bathroom was searched in the same manner as the other girls. *Id.*

Determining that there was no individualized suspicion for the strip searches, the court applied the *Skinner* balancing test. *Id.* at 1166. The court "conclude[d] that the students had an important privacy interest in not being unclothed involuntarily." *Id.* at 1168. It also concluded that the strip searches were highly intrusive, noting that the students had to reveal their underwear and that most of the girls had to expose their breasts. *Id.*

The court determined that the interest at stake was not sufficiently important to justify the searches. *Id.* at 1169. To be sure, school officials have a substantial interest in maintaining discipline in their classrooms, and theft by a student of another student's money could seriously impact the teacher's ability to maintain discipline. *See id.* Nonetheless, the court stated that there was no reason to believe that the officials' interests would have been jeopardized if the teacher and police officer were required to have individualized suspicion

17

before subjecting the students to a strip search.  *Id.*  It concluded that "the alleged theft of twenty-six dollars, while certainly not insignificant in the context of a grade school, does not present such an extreme threat to school discipline or safety that children may be subject to intrusive strip searches without individualized suspicion."  *Id.*

With regard to Lenard, the court in *Thomas I* found that this "cursory" search was reasonable.  *Id.* at 1170.  While the police officer did not have individualized suspicion, it was reasonable for him to conclude that Lenard was a member of the class who had been sent in to be searched.  *Id.*  While Lenard did have a legitimate privacy interest in the contents of his pockets and pants, the court reasoned, the search was "far less intrusive" than that to which the other students were subjected.  *Id.*  Accordingly, the court concluded that the search was justified absent individualized suspicion, and thus that it was justified in its inception.  *See id.*  The court further concluded that the measures taken were reasonably related to the goals of the search and not excessively intrusive.  *Id.*  Because the officer had at least some suspicion that Lenard might have taken the money and only subjected him to a cursory search, the search did not violate the Fourth Amendment.  *See id.*

Turning to the searches in this case, the Court finds that Defendants did not have individualized suspicion that any of Knight's students took the makeup bag.  Defendants argue that they "had reasonable grounds to suspect that a search of the student plaintiffs would reveal that one or more of them were violating the law and school policy."  This may be correct, but individual suspicion is required.  Defendants' grounds for suspicion are

weaker than those of the school officials in *Thomas I*, in which the court found individualized suspicion to be lacking.  *See Thomas I*, 261 F.3d at 1167.  In that case, the money disappeared while the students were in the classroom and it was discovered to be missing almost immediately.  *Id.* at 1163.  Here, Knight left her door open when she took her class to lunch and she did not discover that her makeup bag was missing until she and her class returned from lunch.  Defendants searched A.A. and B.H. even thought Knight told Defendants that they could not have taken her makeup bag and money.  While Defendants may have reasonably suspected that one or more of Knight's students took the makeup bag, they "did not possess individualized suspicion that pointed to a specific student or group of students as responsible."  *See Thomas I*, 261 F.3d at 1167.  In determining whether the searches were justified at their inception, the Court will therefore consider whether the searches were justified absent individualized suspicion.  *See id.*

Addressing first the classroom searches,[15] the Court concludes that those searches that did not involve touching the students were justified even in the absence of individualized suspicion.  While their object was not drugs or weapons, the classroom searches took place when both Knight's money and her $450 makeup bag were missing.  Defendants had an important interest in promoting order and discipline in the classroom and in not allowing the perpetrator to go unpunished.  This interest outweighs Plaintiffs' privacy interest in their

---

[15] The parties do not spend a great deal of time in their briefs discussing the classroom searches, instead focusing their arguments on the strip searches.  Because Defendants seek summary judgment as to Plaintiffs' claims predicated both on the classroom and strip searches, however, the Court will address both searches.

book bags, books, purses, pockets, socks, and shoes, and the contents of their pockets.  As

the district court stated in *Thomas I*,

> [H]ad the teacher limited her search to a search of the book
> bags, desks, or purses of the students in the class, this Court
> would have no problem concluding that such measures were
> reasonable pursuant to the second prong of the *T.L.O.* test . . . .
> [H]ad the teacher required the children to empty their pockets or
> even take off their shoes and socks to search for the money, the
> Court would not view that measure as unreasonable.

*Thomas v. Clayton County Bd. of Educ.*, 94 F. Supp. 2d 1290, 1306 (N.D. Ga. 1999).

Further, the classroom searches, except for those that involved the touching of students, were

minimally intrusive.  Defendants simply required Plaintiffs to empty their binders, take off

their shoes and socks, empty their pockets, and pull out their pockets to expose anything they

might have hidden there.  The Court therefore concludes that the searches that did not

involve touching of the students by Defendants did not violate the Fourth Amendment.

The portion of the classroom searches in which Grant and Alexander reached into

some of the Plaintiffs' pockets requires further discussion regarding the scope of the search.

As set forth in the statement of facts, Grant patted two female Plaintiffs' pockets, and she put

her hands in three male Plaintiffs' pockets.  In addition, she reached into one male Plaintiff's

pockets after he complied with her instructions to turn them out.  Alexander reached into a

male Plaintiff's pockets.

These searches were clearly more intrusive than the rest of the classroom searches.

While not as intrusive as a strip search, the searches at issue here went beyond merely

looking through Plaintiffs' book bags and purses or viewing the contents of their pockets. As the Eleventh Circuit has explained, "[T]here is no question that schoolchildren retain a legitimate expectation of privacy in their persons." *Thomas I*, 261 F.3d at 1168. In addition, the gender of the participants is relevant. *See T.L.O.*, 469 U.S. at 342 ("[T]he measures adopted [must be] reasonably related to the objectives of the search and not excessively intrusive in light of the . . . sex of the student."). Five of the searches were performed by Grant or Alexander on a male Plaintiff, even though Screws was apparently available to undertake such a search.

Determining whether these searches were limited in scope is a more difficult question than those of the rest of the classroom searches or the strip searches. *Thomas I* provides good guidance as to the latter searches. However, there is a large factual difference in *Thomas I* between the unreasonable strip searches and the reasonable search of Lenard, making it less clear in which category the search at issue properly belongs. Nonetheless, the Court concludes that these searches were not excessively intrusive and that they were permissible in scope. It is clear that Grant and Alexander had some suspicion that the students they searched took the makeup bag. To be sure, five of the searches were undertaken by a teacher on a student of the opposite gender. However, the searches were considerably less intrusive than the strip searches in *Thomas I*, and were more similar to the search of Lenard in that case. *See Thomas I*, 261 F.3d at 1170 ("Because [the officer] had at least *some* suspicion that Lenard may have had the envelope and conducted only a cursory search of Lenard's person,

21

we conclude that [the search] was reasonable under the Fourth Amendment.").  The Court therefore finds that these searches did not violate the Fourth Amendment.

The Court now turns to the strip searches.   Having determined that Defendants did not have individualized suspicion, the Court then asks whether the searches can be justified absent such suspicion.  The Eleventh Circuit in *Thomas I* had "little trouble in concluding that the strip searches . . . were unconstitutional," *see id.* at 1167, and the facts in this case are similar to those in *Thomas I*.  The search here was occasioned by the possible theft of a twelve dollars, rather than a student's possession of drugs or weapons.  The students were subjected to intrusive strip searches that involved removal of their clothing.  It is true that Grant's searches were less intrusive than those performed by the other Defendants.  The Court still finds that they were unreasonable in scope.  While she did not have the students drop their pants, she still had them raise their shirts to their shoulders and turn around while she inspected them.  The strip searches here were, as in *Thomas I*, excessively intrusive in light of the suspected infraction.  *See id.* at 1169 ("[T]he alleged theft of twenty-six dollars, while certainly not insignificant in the context of a grade school, does not present such an extreme threat to school discipline or safety that children may be subject to intrusive strip searches without individualized suspicion.").   They therefore violated the Fourth Amendment.

Defendants make several arguments based on their characterization of the facts of the case.  Defendants contend that the plaintiffs were never told to remove their clothing.  They

also argue that the boys were only required to raise their shirts and "slightly lower their pants to expose the waistband of their underwear."  However, Plaintiffs testified that they had to drop their pants to their knees or to their ankles.  Defendants also claim that the girls were not required to lower their pants.  To the contrary, Grant told the students she searched to lower their pants.  Viewing the evidence in the light most favorable to Plaintiffs, all of the Plaintiffs were told to raise their shirts and most of them were told to drop their pants.  Plaintiff's contentions are not accurate in light of the procedural posture of this case.  In any event, the searches by Grant were excessive in scope despite the fact that she did not tell the students to lower their pants.

It is true, as Defendants point out, that unlike the searches performed in *Thomas I*, the searches here were not undertaken in groups of four or five students.  However, this difference does not change the result.  The court in *Thomas I* focused on the intrusiveness of the search and the fact that the students had to remove clothing.  The instant searches were unreasonable in scope despite the fact that the students were searched individually or in groups of two, rather than in groups of four or five.

Defendants cite *Jenkins by Hall v. Talladega City Board of Education*, 115 F.3d 821 (11th Cir. 1997) (en banc), in support of their contention that the searches here did not violate the Fourth Amendment.  *Jenkins*, however, is inapposite.  In that case, three students were implicated by other students in the theft of seven dollars.  *Id.* at 822.  When a more limited search did not turn up the money, school officials took two of the students to the bathroom,

23

where they were told to enter stalls and come out with their underwear down to their ankles. *Id.* The Eleventh Circuit did not address whether there was a constitutional violation, instead addressing only whether the defendants should have known that their conduct violated a clearly established constitutional right. *See id.* at 824-28. In any case, *Jenkins* is distinguishable on its facts. To be sure, Defendants did not require any students to remove their underwear. However, they did not have individualized suspicion and the searches here, while not as intrusive as those in *Jenkins*, were nevertheless significantly intrusive. The Court concludes that the searches were unreasonable and that they therefore violated the Fourth Amendment.

*B. Qualified Immunity*

Because the classroom searches did not violate the Fourth Amendment, Defendants are entitled to qualified immunity on Plaintiff's claims predicated on those searches. Defendant's Motion is due to be GRANTED on Plaintiff's claims based on the searches that took place in Knight's classroom. The Court now turns to the strip searches.

"Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lassiter v. Ala. A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002). The Court will

therefore consider (1) whether Defendants were performing a discretionary function when they searched Plaintiffs, and (2) whether Defendants' actions violated "clearly established" law.

"To be eligible for qualified immunity, the official must first establish that he was performing a 'discretionary function' at the time the alleged violation of federal law occurred." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (citing *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1263-64 (11th Cir. 2004)). "To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'" *Crosby*, 394 F.3d at 1332 (quoting *Holloman*, 370 F.3d at 1265). "Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman*, 370 F.3d at 1265.

The Court concludes that Defendants were pursuing a job-related goal because they were attempting to find out whether a student had taken Knight's possessions and teach the students that theft would be punished. The question, then, is whether Defendants were acting within their authority.

School board policy, as described in the Handbook, prohibits the searches that occurred in this case. The Handbook requires that any search may only be undertaken when there are "reasonable grounds for believing that a search of a particular student will produce

evidence of a violation of school disciplinary rules or of law." It further states that if a "more intrusive search (i.e., a strip search), is needed," the school official should call the parents of the suspected student and the police, who should perform the search. It states that school employees should not conduct any search more intrusive than a pat-down search or a search of a student's pockets. Defendants argue that the school board policy set out in the Handbook does not specify what actions they were to take under these circumstances and that the language of the Handbook suggests that the Defendants use their judgment in carrying out a search. However, based on the language of the Handbook, the Court finds that the searches at issue were beyond Defendants' authority and that therefore they were not performing a discretionary function. The Court in any event concludes that Defendants cannot meet the second prong of the test.

Prior to the Supreme Court's decision in *Hope v. Pelzer*, 536 U.S. 730 (2002), the Eleventh Circuit required that for a right to be clearly established, "the federal law by which the government official's conduct should be evaluated must be preexisting, obvious and mandatory so that a similarly situated, reasonable government agent would be on notice that his or her questioned conduct violates federal law under the circumstances." *See Hope v. Pelzer*, 240 F.3d 975, 981 (11th Cir. 2001) (quotation omitted), *rev'd*, 536 U.S. 730 (2002). The court noted that "[i]t is important to analyze the facts in these cases, and determine if they are 'materially similar' to the facts in the case in front of us." *Id.*

In *Hope*, the Supreme Court rejected this "rigid gloss on the qualified immunity

26

standard." *Hope*, 536 U.S. at 739.  Rather, the Court explained, the defendants must be "on notice that their conduct is unlawful." *Id.*  "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quotation omitted).  The Court emphasized that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741.  "Materially similar" facts are not necessary to a finding that the law is clearly established, though they can provide support for such a conclusion. *Id.*  The "salient question" is whether the state of the law at the time of the incident gave the defendants "fair warning that their alleged [actions were] unconstitutional." *Id.*  "[T]he law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Wilson v. Strong*, 156 F.3d 1131, 1135 (11th Cir. 1998) (quoting *Jenkins*, 115 F.3d at 826 n.4).

Defendants argue that even if their actions violated the Fourth Amendment, the state of the law at the time of the incident was not sufficiently clear to put them on notice that their conduct was unconstitutional.  Defendants contend that even *Thomas I* and *Thomas v. Roberts*, 323 F.3d 950 (11th Cir. 2003) (*Thomas II*), did not give them fair warning.  They argue that the search was minimal and that the students did not remove any clothing. Defendants claim that *Thomas I* and *Thomas II* (collectively "*Thomas*") could not have given them fair warning that individual, private searches in which students did not remove any

clothing would be unconstitutional.

To the extent that Defendants try to distinguish *Thomas*, those efforts are unavailing. Their contention that no student was required to remove his or her clothing is inaccurate. As stated previously, viewing the evidence in the light most favorable to Plaintiffs, all of the Plaintiffs were required to lift their shirts and most of them were required to drop their pants. Defendants did not have individualized suspicion. At the time of the strip searches, the object of the search was twelve dollars. The strip searches here were similar to those in *Thomas*. To be sure, there are factual differences. The searches here were not conducted in groups of four or five, no student in this case dropped his or her underwear, and the students in *Thomas* were in fifth grade while the students here were in seventh grade. Despite the factual differences, the Court concludes that the facts of this case are similar enough to those of *Thomas* to give Defendants fair warning that the strip searches they conducted violated the Fourth Amendment. To grant qualified immunity under these circumstances would be to return to the "materially similar" standard that the Supreme Court rejected in *Hope*.[16] Accordingly, Defendants are not entitled to qualified immunity on Plaintiffs' strip search claims and their Motion is due to be DENIED as to those claims.

---

[16] The Court notes that the facts here are similar enough to those in *Thomas* that qualified immunity might well be unavailable even under the "materially similar" standard. However, the Court need not decide that question.

## II. Plaintiffs' State Law Tort Claims

Plaintiffs claim that Defendants committed the torts of assault, battery, invasion of privacy, and outrage. Defendants first argue that they are entitled to state-agent immunity. Alternatively, they argue that Plaintiffs have not offered sufficient evidence supporting their tort claims to survive summary judgment.

## A. State-Agent Immunity

The Constitution of Alabama provides, "[T]he State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. art. I, § 14. This provision affords immunity to State agents in their individual capacities under certain conditions. *See Wood v. Kesler*, 323 F.3d 872, 883 n.19 (11th Cir. 2003). The Alabama Supreme Court recently restated the law of State-agent immunity. *See Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) (plurality opinion); *see also Ex Parte Butts*, 775 So. 2d 173, 177-78 (Ala. 2000) (adopting the restatement enunciated in *Cranman*). That restatement provides, in pertinent part:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
> . . . .
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in . . . educating students.

*Cranman*, 792 So. 2d at 405. *Cranman* also provides, however, that "a State agent *shall not* be immune from civil liability in his or her personal capacity . . . (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under

29

a mistaken interpretation of the law." *Id.*

Based upon the foregoing language, the Alabama Supreme Court has stated in dicta that State-agent immunity does not provide protection from claims for intentional torts. *See Gary v. Crouch*, 867 So. 2d 310, 313-14 (Ala. 2003). Plaintiffs do not appear to argue, in opposing Defendants' entitlement to State-agent immunity, that Defendants acted willfully or maliciously. Rather, they contend that the searches were beyond Defendants' authority. The Court concludes that the acts alleged were indeed beyond Defendants' authority and that they are therefore not entitled to State-agent immunity.

The Alabama Supreme Court has applied a burden-shifting process to resolve claims of State-agent immunity:

> In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity. If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority.

*Ex parte Estate of Reynolds*, __ So. 2d __, 2006 WL 1578608, at *2 (Ala. June 9, 2006) (citations omitted). "A State agent acts beyond authority and is therefore not immune when he or she fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003) (quotation and alteration omitted).

The Court finds that Defendants were exercising judgment in the discharge of their duties in educating students. The burden thus shifts to Plaintiffs to show that Defendants

acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority.

Plaintiffs argue that the searches in this case were "beyond [Defendants'] authority" and that therefore Defendants are not entitled to State-agent immunity. They contend that school board policy prohibits the searches carried out here.

Plaintiffs further assert that this case is controlled by *Giambrone v. Douglas*, 874 So. 2d 1046 (Ala. 2003). In that case, the defendant, the head coach of a high school wrestling team, engaged in a "full speed" challenge match with the plaintiff, a freshman, who was much smaller than the coach. *Id.* at 1049. The student, rendered quadriplegic during the match, sued the coach, who asserted State-agent immunity. *Id.* In response, the student claimed that the coach had, among other things, violated guidelines of a national wrestling federation and a code of conduct of the state athletic association. *Id.* The guidelines prohibited certain dangerous holds and illegal headlocks. *Id.* at 1054. The code of conduct provided that coaches should not allow matches between individuals of widely disparate physical abilities. *Id.*

The court concluded that the coach was not entitled to State-agent immunity because "a trier of fact could determine" that he "fail[ed] to discharge his duties pursuant to 'detailed rules or regulations.'" *Id.* at 1055. It noted that the coach's authority to exercise judgment in the safe conduct of the team's practices was limited by the guidelines and rules imposed by the school's athletic director. *Id.* at 1054. Among those were the aforementioned guidelines and code of conduct. *Id.*

31

The coach also argued, as do Defendants here, that the guidelines and rules were not sufficiently detailed. *Id.* The court distinguished the guidelines and rules in *Giambrone* from those in *Ex parte Spivey*, 846 So. 2d 322 (Ala. 2002). In *Spivey*, a student was injured while using a shaper that he claimed lacked certain safety features. *Giambrone*, 874 So. 2d at 1055. The student cited regulations generally providing that "teachers should ensure the safety of the students and report injuries." *Id.* The *Spivey* court concluded that these regulations were "general statements" regarding safety, not "detailed rules and regulations." *Id.* The *Giambrone* court distinguished these "general statements" in *Spivey* from the guidelines in *Giambrone*, holding that "the guidelines and rules provided specific instructions" and "removed [the coach's] judgment in determining" whether he should have engaged in the wrestling match. *Id.*

The Court concludes that Defendants were acting beyond their authority in carrying out the searches. As in *Giambrone*, there were clear, specific guidelines that governed Defendants' conduct. Board policy provides that to conduct any search, the school official must have "reasonable grounds for believing that a search of a particular student will produce evidence" of misconduct. As noted above, Defendants did not have reasonable grounds to believe that a particular student in the class was culpable. Further, the Handbook provides that searches be conducted by officials of the same gender as the student searched and that except in an emergency the searches "shall be conducted discretely out of public view." Finally, the policy provided that school officials should not conduct a "more intrusive search

(i.e., a strip search)" than a pocket search or a pat-down.  A trier of fact could determine that Defendants "fail[ed] to discharge [their] duties pursuant to 'detailed rules or regulations.'" *See Giambrone*, 874 So. 2d at 1055.

Defendants contend that *Giambrone* is distinguishable and that "its holding is not easily applied to this case."  They argue that the issue here is not whether the Board policy apply to the searches conducted by Defendants, but rather whether the searches violated the Plaintiffs' rights.  To the contrary, the issue here is whether Defendants failed to discharge their duties pursuant to "detailed rules or regulations," and that is the question that the Alabama Supreme Court addressed in *Giambrone*.

Instead, Defendants claim that *Gowens v. Tys. S.*, __ So. 2d __, 2006 WL 1195876 (Ala. May 5, 2006), is analogous to this case.  There, the regulations in question provided that a social worker verify the number of children in a household from an outside source.  *Id.* at *12.  Because the social worker failed to follow these "detailed rules and regulations," the Alabama Supreme Court denied State-agent immunity.  *See id.*  The Board policy at issue here was similarly specific to that in *Gowens*, and Defendants failed to follow it.  *Gowens* supports the conclusion that State-agent immunity is not appropriate in this case.

Defendants argue that the language of the policy was not sufficiently specific, and that the Board's interpretation of the guidelines was not conveyed to them prior to this incident. The guidelines contained in the Board policy are not the kind of "general statements" that were found to be insufficient to deny State-agent immunity in *Spivey*.  Rather, the Board

policy is sufficiently clear and specific to be "detailed rules and regulations" such as those

in *Giambrone*.

Because Defendants are not entitled to State-agent immunity, the Court will address

the specific torts Plaintiffs claim Defendants committed.

*B.  Assault*

Plaintiffs argue Defendants committed assault when they ordered Plaintiffs to drop

their pants and raise their shirts.  Assault is defined as

> an intentional, unlawful offer to touch the person of another in
> a rude or angry manner under such circumstances as to create in
> the mind of the party alleging the assault a well-founded fear of
> an imminent battery, coupled with the apparent present ability
> to effectuate the attempt, if not prevented.

*Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995) (quotation omitted).  "Words standing

alone cannot constitute an assault.  However, they may give meaning to an act, and when

both are taken together they may create a well-founded fear of a battery in the mind of the

person at whom they are directed, thereby constituting an assault."  *Allen v. Walker*, 569 So.

2d 350, 351-52 (Ala. 1990).

Defendants argue that Plaintiffs' assault and battery claims are subject to the

heightened standard set out in *Suits v. Glover*, 71 So. 2d  49 (Ala. 1954).  In *Suits*, the

Alabama Supreme Court identified elements a student plaintiff would have to prove in order

to recover on for assault and battery based on corporal punishment.  *Id.* at 50.  The Court

agrees with Plaintiffs that the *Suits* standard is applicable to corporal punishment of a student

34

and that it is therefore distinguishable from this case.  Defendants also assert that Plaintiff's

assault and battery claims should be subjected to a "clear and convincing evidence" standard.

The Court agrees with Plaintiffs that the case Defendants cite for that proposition, *Hurst v.

Capitell*, 539 So. 2d 264 (Ala. 1989) (per curiam), restricted the use of that standard to suits

alleging sexual abuse.  *See id.* at 266 ("[W]e are today creating an exception to the [parental

immunity] doctrine, limited to sexual abuse cases only.").  The Court will address Plaintiffs'

assault and battery claims using the traditional elements and burden of proof.

Plaintiffs argue that Defendants' conduct and Plaintiffs' reactions demonstrate that

they feared that they would be subjected to an offensive or harmful touching.  However,

Plaintiffs have not pointed to anything that could be construed as an "intentional, unlawful

offer to touch" Plaintiffs.  While Plaintiffs have identified testimony showing that they were

fearful, ashamed, embarrassed, and humiliated, they have not identified testimony

demonstrating that they feared an imminent battery.  Plaintiffs have not cited any case

supporting the contention that the conduct Defendants allegedly committed could constitute

assault.  Defendants' actions in ordering Plaintiffs to drop their pants and raise their shirts

did not constitute assault.  Defendants' motion is thus due to be GRANTED on Plaintiffs'

assault claims.

*C.  Battery*

Defendants allege that Screws committed battery when he touched certain Plaintiffs

during the strip searches, and that Grant and Alexander did so when they touched certain

Plaintiffs during the searches in Knight's classroom.

"A battery occurs when one actually touches another in a hostile manner." *Kmart Corp. v. Perdue*, 708 So. 2d 106, 110 (Ala. 1997) (citing *Surrency v. Harbison,* 489 So. 2d 1097 (Ala. 1986)). "To succeed on a claim alleging battery, a plaintiff must establish: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998). Battery is an injury "actually done to the person of another in an angry or revengeful or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another." *Surrency*, 489 So. 2d 1097, 1104 (quoting *Singer Sewing Mach. Co. v. Methvin*, 63 So. 997, 1000 (1913)).

Defendants mistakenly argue that no Plaintiff testified to being touched during the strip searches. It is clear that T.A., T.S., and C.W. testified that Screws touched them during the search. Also, Grant and Alexander searched the pockets of several students.

Defendants contend that there is no evidence that they acted in a rude or angry manner. However, Plaintiffs note that they allege that the touching was offensive. According to the Alabama Supreme Court, an intentional touching may be a battery if it is "conducted in a harmful or offensive manner." *See Atmore Cmty. Hosp.*, 719 So. 2d at 1193. Plaintiffs further note that this Court has found a question of fact as to whether there was a battery where the plaintiff was "surprised" and "shocked" by the defendant's conduct. *See*

*Portera*, 996 F. Supp. at 1437.

C.W., T.A., and T.S. testified that they were "embarrassed," "ashamed," and "upset," respectively, about the strip search. Based on *Portera*, the Court concludes that a jury could find that Screws' touching of T.A., T.S., and C.W. was conducted in an offensive manner. Defendants' Motion is therefore due to be DENIED with respect to these claims.

As for the classroom searches, some of the Plaintiffs have provided sufficient evidence to demonstrate that Grant and Alexander's touching of the students was done in a "harmful or offensive manner," based on *Portera*. As Plaintiffs have pointed out, A.A. testified to being "somewhat" scared by the strip search while C.W. testified that he was "mad" about the search. Plaintiffs note that J.R. testified that Alexander told him not to tell his mother that she was harassing him. Defendants' Motion is therefore due to be DENIED with respect to Plaintiffs' battery claims for the classroom searches of A.A., C.W., and J.R.

Plaintiffs have not pointed to evidence demonstrating that a touching was done in an offensive manner with respect to the searches of H.J., J.H., P.M., T.A., or E.H. They do not point to any evidence of the first four students' reactions to being touched in the classroom. They point to evidence that E.H. was humiliated by the strip search and the search of her purse, but not that the search of her pockets was done in an offensive manner. Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Defendants did not commit battery on these students. As such, Defendants' motion is GRANTED with respect to the classroom searches of H.J., J.H., P.M., T.A., and E.H.

*D.  Invasion of Privacy*

Plaintiffs allege that Defendants intruded upon Plaintiffs' private activities and bodily integrity when they subjected Plaintiffs to the strip searches.  In addition, they argue that Alexander intruded upon E.H.'s private activities and publicized her private affairs when she stated that E.H. had a condom and tampon in her purse.

"The tort of invasion of privacy is the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Wright*, 654 So. 2d at 544.  The Alabama Supreme Court has recognized four types of invasion of privacy:

> It is generally accepted that invasion of privacy consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use.

*Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997).  "[E]vidence of an invasion of privacy must be a course of conduct which rises to a level that has been previously held to constitute an invasion of privacy."  *Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1435 (M.D. Ala. 1998) (Albritton, J.).

With respect to the first type of invasion of privacy, wrongful intrusion, "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy,

if the intrusion would be highly offensive to a reasonable person." *Id.* at 702 (quoting Restatement (Second) of Torts § 652B (1977)).

In *Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1435 (M.D. Ala. 1998) (Albritton, J.), the plaintiff provided evidence showing that the defendant placed his hands on her buttocks and inside her blouse. *Id.* at 1432. He also gave her nonconsensual hugs, made several sexually suggestive remarks, and repeated an arguably harassing comment on a daily basis. *Id.* The Court found that the conduct alleged by Plaintiff did not constitute invasion of privacy. *Id.* at 1436.

With respect to the second type of invasion of privacy, giving publicity to private information, liability is established if one "gives publicity to a matter concerning the private life of another . . . if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *S.B. v. Saint James Sch.*, __ So. 2d __, 2006 WL 3530651, at *13 (Ala. Dec. 8, 2006) (quoting Restatement (Second) of Torts § 652D) (internal quotation marks omitted).

Turning first to the strip searches, the Court concludes that there is insufficient evidence to demonstrate that Defendants intentionally intruded on Plaintiffs' physical solitude or seclusion to the degree required under Alabama law. Plaintiffs have not cited a case that found liability for invasion of privacy for similarly intrusive conduct, and the Court has not found any such case. The conduct here is no more intrusive than that in *Portera*, in which the plaintiff was touched on her buttocks and inside her blouse, in addition to enduring

39

repeated verbal harassment.  Defendants are entitled to summary judgment on Plaintiffs' strip search claims.

Plaintiffs argue that Alexander both intruded upon E.H.'s private activities and publicized private matters.  The Court finds that the actions alleged do not rise to the level of either type of invasion of privacy.  With regard to wrongful intrusion, the Court concludes that the actions here are not as intrusive as those in *Portera*, so they are not sufficient to withstand summary judgment.

Turning to Plaintiffs' claim that Alexander gave publicity to private information, Defendants have not cited any case finding such wrongful publicity with facts similar to those here.  Nor has the Court found such a case.  The Court finds that the course of conduct here does not rise to level that has been held to constitute invasion of privacy.  As such, Defendants' Motion is due to be GRANTED on Plaintiffs' invasion of privacy claims.

## E.  Outrage

Plaintiffs argue that Defendants committed the tort of outrage when they strip searched Plaintiffs.  To prevail on such a claim, a plaintiff must prove that: "(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) that the distress was severe." *Harris v. McDavid*, 553 So. 2d 567, 569-70 (Ala. 1989).  "The plaintiff must produce sufficient evidence to show that the defendant's conduct is so outrageous in character and so extreme

in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Wright*, 654 So. 2d at 544 (quotation omitted).

Plaintiffs argue that several factors demonstrate that Defendants' conduct was extreme and outrageous.  They note, among other things, that Defendants violated school board policy, had no training in searches, did not call law enforcement, did not have individualized suspicion, and conducted the strip search to find money that Knight herself stated did not matter to her.  However, the Court finds that, even when viewing the evidence in the light most favorable to Plaintiffs, they have not produced sufficient evidence to satisfy the second element.  While not approving of or excusing Defendants' conduct, the Court cannot conclude that it rises to the level of being "regarded as atrocious and utterly intolerable in a civilized society."  *See id.*  Defendant is therefore entitled to summary judgment on Plaintiffs' outrage claims.

### CONCLUSION

For the reasons stated above, it is hereby ORDERED that Defendants' Motion for Summary Judgment (Doc. # 40) filed June 26, 2006, is GRANTED IN PART and DENIED IN PART.  It is ORDERED that the Motion is:

(1) GRANTED with respect to Plaintiffs' § 1983 claims regarding the classroom searches;

(2) DENIED with respect to their § 1983 claims for the strip searches;

(3) GRANTED with respect to Plaintiffs' assault claims;

41

(4) DENIED with respect to Plaintiffs' battery claims for the strip searches of C.W., T.A., T.S.;

(5) DENIED with respect to Plaintiffs' battery claims for the classroom searches of A.A., C.W., and J.R.;

(6) GRANTED with respect to Plaintiffs' battery claims for the classroom searches of H.J., J.H., P.M., T.A., and E.H.;

(7) GRANTED with respect to Plaintiffs' invasion of privacy claims; and

(8) GRANTED with respect to Plaintiffs' outrage claims.

DONE this the 16th day of April, 2007.


/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE